**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MING DAI,

*Petitioner*,

v.

JEFFERSON B. SESSIONS III, Attorney General,

*Respondent*.

No. 15-70776

Agency No.
A205-555-836

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted October 13, 2017[*]
San Francisco, California

Filed March 8, 2018

Before: Sidney R. Thomas, Chief Circuit Judge, and
Stephen Reinhardt and Stephen S. Trott, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Trott

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

# SUMMARY[**]

## Immigration

The panel granted a petition for review of the Board of Immigration Appeals' denial of asylum and withholding relief.

The panel held that because neither the immigration judge nor the Board made an explicit adverse credibility determination, this court must accept Dai's testimony as true. The panel explained that the REAL ID Act added a provision creating a rebuttable presumption of credibility where the IJ fails to make an explicit adverse credibility determination, but that presumption is rebuttable only before the Board, and is not rebuttable on petition for review before this court.

The panel held that Dai's evidence was sufficiently persuasive, and compelled the conclusion that the harm he suffered from the government due to his resistance to his wife's forced abortion rose to the level of past persecution.

The panel held that because Dai and his wife were not similarly situated, the Board erred in concluding that Dai's wife's voluntary return to China undermined his own fear of future persecution. The panel further held that in the absence of an adverse credibility determination, the Board erred in relying on Dai's untruthfulness about his wife's voluntary return to China in concluding that he failed to meet his burden of proof. The panel also noted Dai's valid asylum

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

claim was not undermined by the fact that he may have had additional reasons (beyond escaping persecution) for coming to or remaining in the United States, including seeking economic opportunity.

The panel held that because Dai established past persecution, he was entitled to a rebuttable presumption of future persecution, which the government did not attempt to rebut with evidence of changed country conditions. The panel stated that giving the government the opportunity to present such evidence at this point would be exceptionally unfair, and thus, Dai established that he was eligible for asylum. The panel remanded for an exercise of discretion of whether to grant Dai asylum relief, and to grant Dai withholding relief.

Dissenting, Judge Trott wrote that the serious legal consequences of the majority opinion as a circuit precedent are that it (1) demolishes both the purpose and the substance of the REAL ID Act (2) disregards the appropriate standard of review, and (3) perpetuates this court's idiosyncratic approach to an IJ's determination that the testimony of an asylum seeker lacks sufficient credibility or persuasiveness to prove his case.

## COUNSEL

David Z. Su, Law Offices of David Z. Su, West Covina, California, for Petitioner.

Aimee J. Carmichael, Trial Attorney; Mary Jane Candaux, Assistant Director; Office of Immigration, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

---

**OPINION**

REINHARDT, Circuit Judge:

Ming Dai is a citizen of China. He testified that he was beaten, arrested, jailed, and denied food, water, sleep, and medical care because he tried to stop the police from forcing his wife to have an abortion. The Board of Immigration Appeals (BIA) nevertheless found that Dai was not eligible for asylum or withholding of removal.

There is one clear and simple issue in this case: neither the Immigration Judge (IJ) nor the BIA made a finding that Dai's testimony was not credible. Under our well-established precedent, we are required to treat a petitioner's testimony as credible in the absence of such a finding. We adopted this rule before the REAL ID Act and reaffirmed it after its passage. The dissent clearly disapproves of our rule. We are, however, bound to follow it. We might add, though it does not affect our holding in this case, that we approve of it. We think it not too much to ask of IJs and the BIA that they make an explicit adverse credibility finding before deporting someone on that basis. In any event, under our well-established rule, Dai is unquestionably entitled to relief.

## BACKGROUND

### I. Dai's Persecution in China[1]

Dai has been married for twenty years to Li Ping Qin. Dai and Qin have a daughter, who was born in 2000. In April 2009, Qin discovered that she was pregnant again. Dai and Qin were "very happy" about the pregnancy and believed they would be able to keep the child if they paid a fine, despite China's One Child policy.

However, the month after Qin found out she was pregnant, she was visited at work by a "family planning officer" who told Qin that she was required to have an abortion. Qin told the officer that she would need to think about it. Two months later, five family planning officers came to Dai and Qin's house early in the morning from "the local family planning office and also the police station." The officers were there to take Qin to the hospital for a forced abortion. Qin told the officers that she didn't want to go and Dai attempted to stop the officers from taking Qin against her will. Dai and the officers began arguing, with the officers telling Dai that Qin had to have the forced abortion as a matter of "Chinese policy" and Dai saying "you can't take my wife away."

When Dai continued resisting the officers' efforts to take Qin for the forced abortion, two of them pushed him to the ground. Dai got up and tried again to stop the officers, so they

---

[1] This factual summary is drawn primarily from Dai's testimony before the IJ. As we discuss in more detail below, we treat Dai's testimony as credible because neither the IJ nor the BIA made an adverse credibility finding.

pushed him to the ground again. This time, the officers handcuffed Dai and repeatedly beat him, causing substantial injuries. While Dai was handcuffed and being beaten, the other officers dragged Qin out of the house.

The police took Dai to the Zha Bei detention center. There, they ordered Dai to confess to resisting arrest. Dai initially refused to confess and insisted that he had the right to protect his family. The officers continued to interrogate him over the next number of days. At times he was deprived of sleep because he was interrogated in the middle of the night. During the ten days he spent in detention, Dai was interrogated approximately seven times. He was fed one meal a day and often denied water. Dai characterized his treatment as "mental[] torture." Dai ultimately confessed to resisting arrest and fighting with the officers. He was released about two days after his confession.

Dai's injuries occurred when the officers beat him at his home. Despite telling the police about his injuries, he received no medical attention while in custody. When he was released he went to the hospital for x-rays, which showed that his right arm was dislocated and the ribs on his right side were broken. The doctor put Dai's arm back in place and wrapped it to keep it still for six weeks. Dai did not receive any treatment for his broken ribs.

When Dai returned home he found Qin crying. Qin told him that she had been taken to the Guang Hua hospital in the Chang Ning district, where a doctor made her get undressed and then sedated her. When she woke up, she learned that her pregnancy had been terminated and that an IUD had been implanted, all without her consent.

In addition to Qin's forced abortion and Dai's arrest, detention, and physical and mental abuse, Qin, Dai, and their daughter each suffered other repercussions arising out of Qin's unauthorized pregnancy and Dai's resistance to her forced abortion. Dai was fired from his job, while Qin was demoted and her salary was reduced by thirty percent. Their supervisors specifically informed them that they were fired and demoted because of the above events. Their daughter was also denied admission to more desirable schools despite good academic performance. Her teacher told Qin that this was likewise because of the events resulting from the illegal pregnancy.

On or about January 27, 2012, Dai, Qin, and their daughter arrived in the United States on tourist visas, with authorization to remain until July 26, 2012. Qin and their daughter returned to China in February while Dai remained in the United States. In the time since Qin and their daughter have returned to China, the Chinese police have come looking for Dai multiple times. Dai is afraid that if he returns to China he will be forcibly sterilized.

## II. Asylum Application

Approximately eight months after arriving in the United States, Dai filed an affirmative asylum application. The next month, he was interviewed by an asylum officer. The asylum officer took notes during the interview, but did not prepare a verbatim transcript.

During the interview, Dai was not asked whether his wife and daughter had accompanied him to the United States. Rather, the asylum officer inquired whether they ever traveled anywhere outside of China. He told the asylum

officer that both his wife and his daughter had been to Taiwan and Hong Kong and that his wife had been to Australia. When asked if they had traveled anywhere else, he said they had not. However, when told that government records showed that his wife and daughter had traveled to the United States with him, he agreed that they had done so. When asked why he did not initially disclose this, Dai said (through an interpreter and according to the non-verbatim notes of the interview), "I'm afraid you ask why my wife and daughter go back." Dai explained that his wife and daughter went back to China "[s]o that my daughter can go to school and in the US you have to pay a lot of money." Finally, Dai was asked, "Can you tell me the real story about you and your family's travel to the US?" Dai responded, "I wanted a good environment for my child. My wife had a job and I didn't and that is why I stayed here. My wife and child go home first."

The asylum officer denied Dai's asylum application.

### III.    Removal Proceedings

The Department of Homeland Security (DHS) then issued Dai a Notice to Appear. Dai conceded that he was removable and sought asylum, withholding of removal, and CAT protection. At a hearing before the IJ, Dai testified about the events in China we have described. When asked why he came to the United States, he said, "[b]ecause I was persecuted in China and my wife, my wife was forced to have an abortion and I lost my baby. I was arrested. I was beaten[]. I lost my job. America [ ] is a free country and it's [ ] a democratic country. I want to come here [ ] and have my very basic human rights. I really, really hate Chinese dictatorship."

During cross-examination, the government asked Dai about his initial failure to disclose his wife and daughter's travel to the United States. Dai testified that "I was very nervous" and "because I was already in the U.S. and they [ ] came with me to the U.S. . . . . I thought that you were asking me anywhere other than the U.S." In response to further questioning by the government, Dai testified that his wife and daughter returned to China so that his wife could care for his father-in-law and his daughter could attend school. When asked why he didn't keep them in the US to protect them from forced IUDs or abortions, Dai reminded the government that his wife's IUD was already inserted before she left China and that his daughter was only 13.

When the government asked Dai if there were any other reasons he was afraid to return to China, Dai said, "if I return to China, it's impossible for me to get another job. . . . Just the sterilization and that." Finally, when asked why he remained in the U.S. when his wife returned to China he responded, "Because at that time, I was in a bad mood and I couldn't get a job, so I want to stay here for a bit longer and another friend of mine is also here." At the time in question (when Qin returned to China in February 2012), Dai did not know about asylum. He first learned about the existence of that process in March of that year.

The IJ did not make an adverse credibility finding. Instead, the IJ found that Dai failed to meet his burden of proof for asylum, withholding of removal, and CAT protection.

## IV.    BIA Decision

The BIA affirmed the IJ's denial of relief. The BIA first found that Dai "failed to disclose both to the [DHS] asylum officer and the [IJ] that his wife and daughter had traveled with him to the United States and voluntarily returned to China shortly after"[2] and that Dai's reason for concealing this information was that "he believed that the true reasons for their return . . . would be perceived as inconsistent with his claims of past and feared persecution."[3]

The BIA acknowledged that the IJ did not make an adverse credibility finding and also did not make one itself. Instead, the BIA held that "the [IJ] need not have made an explicit adverse credibility finding to nevertheless determine that the respondent did not meet his burden of proving his asylum claim." The BIA found that Dai's family returning to China and "his not being truthful about it" were "detrimental to his claim and [ ] significant to his burden of proof." The BIA concluded that Dai failed to establish eligibility for asylum, withholding of removal, or CAT protection. Dai filed

---

[2] The record clearly demonstrates that Dai did not conceal this information from the IJ. If he concealed it at all, it was only from the asylum officer. To the extent the government defends this finding by the BIA, it simply notes that Dai "did not raise the information during direct examination before the Immigration Judge." However, Dai was not asked about his family's travel to the United States and return to China during direct examination, and when he was asked during cross examination he answered truthfully.

[3] The BIA also found that "the respondent's contention that his wife and daughter returned to China before he became aware of the possibility of asylum is not supported by the record." In fact, Dai's testimony on this point was unchallenged and uncontradicted and the government does not defend this erroneous finding before this court.

a timely petition for review challenging the BIA's denial of relief.

## SCOPE AND STANDARD OF REVIEW

"[W]e cannot deny a petition for review on a ground [upon which] the BIA itself did not base its decision." *Hernandez-Cruz v. Holder*, 651 F.3d 1094, 1110 (9th Cir. 2011). We review the agency's factual findings for substantial evidence. *Hamazaspyan v. Holder*, 590 F.3d 744, 747 (9th Cir. 2009).

The scope of review in this case is unclear. While the BIA stated that it "adopt[ed] and affirm[ed] the Immigration Judge's decision," it then went on to discuss and agree with most of the IJ's specific reasons while omitting any discussion of one of them.

On the one hand, we have held that when "the BIA adopts the decision of the IJ and affirms without opinion, we review the decision of the IJ as the final agency determination." *Smolniakova v. Gonzales*, 422 F.3d 1037, 1044 (9th Cir. 2005); *see also Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994). In this case, however, the BIA did not affirm "without opinion."

On the other hand, we have also held that when "the BIA relie[s] upon the IJ's opinion as a statement of reasons" but "state[s] with sufficient particularity and clarity the reasons for denial of asylum and d[oes] not merely provide a boilerplate opinion," we "look to the IJ's oral decision [only] as a guide to what lay behind the BIA's conclusion." *Tekle v. Mukasey*, 533 F.3d 1044, 1051 (9th Cir. 2008) (quotation marks and alterations omitted). "In so doing, we review here

the reasons explicitly identified by the BIA, and then examine the reasoning articulated in the IJ's oral decision in support of those reasons. . . . Stated differently, we do not review those parts of the IJ's . . . finding that the BIA did not identify as 'most significant' and did not otherwise mention." *Id.*; *see also Lai v. Holder*, 773 F.3d 966, 970 (9th Cir. 2014). However, in those cases the BIA did not say that it was adopting the decision of the IJ.

Finally, this is not a case in which "the BIA adopt[ed] the immigration judge's decision and also add[ed] its own reasons." *Nuru v. Gonzales*, 404 F.3d 1207, 1215 (9th Cir. 2005). The BIA did not "add[] its own reasons;" rather, it identified and expressly agreed with some (but not all) of the IJ's reasons.

We need not, however, resolve the precise scope of review in this case because none of the reasons advanced by the IJ, including the one omitted by the BIA, provides a sufficient basis for the BIA's decision.

## DISCUSSION

## I.  Asylum

Asylum is available to refugees—that is, anyone who is "'unable or unwilling to avail himself or herself of the protection of [his or her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Baghdasaryan v. Holder*,

592 F.3d 1018, 1022–23 (9th Cir. 2010) (quoting 8 U.S.C. § 1101(a)(42)(A)).[4]

If a noncitizen establishes past persecution, "a rebuttable presumption of a well-founded fear arises, and the burden shifts to the government to demonstrate that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear." *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) (quotation marks and citations omitted). "An applicant alleging past persecution has the burden of establishing that (1) his treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Baghdasaryan*, 592 F.3d at 1023.

This case is governed by the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 231, 302–23. Under the standards established by that Act, an applicant's testimony alone is sufficient to establish eligibility for asylum if it satisfies three requirements: the "testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). In determining whether the testimony is persuasive, "the trier of fact may weigh the credible testimony along with other evidence of record." *Id.* If the applicant's testimony satisfies all three requirements, then it "alone meets the applicant's burden of proof." *Ren v. Holder*, 648 F.3d 1079, 1093 (9th Cir. 2011). If, however, the

---

[4] By "native country" we mean a person's country of nationality "or, in the case of a person having no nationality, . . . [the] country in which such person last habitually resided." 8 U.S.C. § 1101(a)(42)(A).

applicant's credible testimony alone is not sufficiently persuasive, "the IJ must give the applicant notice of the corroboration that is required and an opportunity either to produce the requisite corroborative evidence or to explain why that evidence is not reasonably available." *Id.*[5] No notice regarding corroboration was given to Dai. We will next examine the three requirements under the Act for meeting the burden of proof, though not in the order listed in the statute.

## A. Credibility

Dai testified at his removal hearing and the IJ made no adverse credibility finding. When this was called to the BIA's attention, it also made no adverse credibility finding. Although the BIA identified one time that Dai allegedly failed to disclose a fact and indicated that it did not believe Dai's explanation for not doing so, "this sort of passing statement does not constitute an adverse credibility finding." *Kaur v. Holder*, 561 F.3d 957, 962–63 (9th Cir. 2009). The BIA may find that an applicant lied about one particular fact without making a general adverse credibility finding. Even a "statement that a petitioner is 'not entirely credible' is not enough" to constitute an adverse credibility finding, *Aguilera-Cota v. I.N.S.*, 914 F.2d 1375, 1383 (9th Cir. 1990), and the BIA's finding that Dai "failed to disclose" a single fact does not even rise to the level of a finding that a petitioner is "not entirely credible." In short, the adverse credibility finding must be explicit.

---

[5] The IJ must also provide notice and an opportunity to produce corroboration or explain its absence if an adverse credibility finding will be based on a lack of corroborating evidence. *Lai*, 773 F.3d at 975–76.

Large portions of the dissent are devoted to elaborating on the deference that we owe to credibility findings by the IJ and the BIA. We agree that such findings are entitled to deference, but we cannot defer to a finding that does not exist. The bulk of our dissenting colleague's concerns can therefore be reduced to his objection to the rule that adverse credibility findings must be explicit. It is difficult to identify, however, a more well-established rule in the review of immigration cases.[6] The dissent offers no reason to overturn our longstanding requirement that adverse credibility findings be explicit and, in fact, the REAL ID Act codifies the principle that such findings must be "explicitly made." 8 U.S.C. § 1158(b)(1)(B)(iii). Therefore, "[t]he IJ's decision not to make an explicit adverse credibility finding," Dissent at 30, means that there is no finding to which we can defer.[7]

---

[6] *See, e.g.*, *She v. Holder*, 629 F.3d 958, 964 (9th Cir. 2010); *Tijani v. Holder*, 628 F.3d 1071, 1080 (9th Cir. 2010); *Edu v. Holder*, 624 F.3d 1137, 1143 n.5 (9th Cir. 2010); *Karapetyan v. Mukasey*, 543 F.3d 1118, 1123 n.4 (9th Cir. 2008); *Meihua Huang v. Mukasey*, 520 F.3d 1006, 1007–08 (9th Cir. 2008) (per curiam); *Singh v. Gonzales*, 491 F.3d 1019, 1025 (9th Cir. 2007); *McDonald v. Gonzales*, 400 F.3d 684, 686 n.2 (9th Cir. 2005); *Mansour v. Ashcroft*, 390 F.3d 667, 671–72 (9th Cir. 2004); *Zhang v. Ashcroft*, 388 F.3d 713, 718 (9th Cir. 2004) (per curiam); *Lopez-Alvarado v. Ashcroft*, 381 F.3d 847, 851 (9th Cir. 2004); *Kalubi v. Ashcroft*, 364 F.3d 1134, 1137–38 (9th Cir. 2004); *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 658–59 (9th Cir. 2003); *Shoafera v. I.N.S.*, 228 F.3d 1070, 1074 n.3 (9th Cir. 2000); *Navas v. I.N.S.*, 217 F.3d 646, 652 n.3 (9th Cir. 2000); *Prasad v. I.N.S.*, 101 F.3d 614, 616 (9th Cir. 1996); *Hartooni v. I.N.S.*, 21 F.3d 336, 342 (9th Cir. 1994).

[7] The dissent places great weight on *Ling Huang v. Holder*, 744 F.3d 1149 (9th Cir. 2014). The distinction between that case and this could not be clearer: "[T]he IJ found that Huang's testimony was not credible." *Id.* at 1151.

Given that there is no adverse credibility finding from the agency, the next question is whether we can *nostra sponte* decide that Dai's testimony is not credible. Prior to the REAL ID Act, we held that in the absence of an explicit adverse credibility finding by the IJ or the BIA we are required to treat the petitioner's testimony as credible. *Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004); *Navas v. I.N.S.*, 217 F.3d 646, 652 n.3 (9th Cir. 2000). The REAL ID Act enacted a variety of changes to the standards governing credibility determinations, including—as noted by the dissent—a provision that "if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii).

Neither this provision nor anything else in the REAL ID Act explicitly or implicitly repeals the rule that in the absence of an adverse credibility finding by the IJ or the BIA, the petitioner is deemed credible. To the contrary, in a post-REAL ID opinion we stated and applied that rule. *See Zhiqiang Hu v. Holder*, 652 F.3d 1011, 1013 n.1 (9th Cir. 2011); *see also Kazemzadeh v. U.S. Attorney Gen.*, 577 F.3d 1341, 1354 (11th Cir. 2009) (W. Pryor, J.) (post-REAL ID application) ("Where an [Immigration Judge] fails to explicitly find an applicant's testimony incredible and cogently explain his or her reasons for doing so, we accept the applicant's testimony as credible.") (quotation marks omitted). *Hu* controls here, a fact the dissent entirely fails to acknowledge. However, in *Hu* we did not explain why our rule was unaffected by the new language in the REAL ID Act. We take this opportunity to do so now.

Properly understood, the rebuttable presumption provision of the REAL ID Act applies only to appeals to the BIA, not

to petitions for review in our court.[8] This is demonstrated by the fact that the statute says there is "a rebuttable presumption of credibility *on appeal*." 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C) (emphasis added). In immigration cases, we do not exercise appellate jurisdiction. Rather, decisions by the finder of fact, the IJ, may be appealed to the BIA. *See* 8 C.F.R. § 1003.1(b). We generally cannot review an order of removal unless the non-citizen has exhausted his appeal to the BIA. 8 U.S.C. § 1252(d)(1); *see Ren*, 648 F.3d at 1083–84. The "sole and exclusive means for *judicial* review of an order of removal" is by "a petition for review," not a further appeal. 8 U.S.C. § 1252(a)(5) (emphasis added). Moreover, unlike an appeal, which shifts an existing action to a new court, a petition for review commences a new action against the United States. 28 U.S.C. § 2344; *see also* 8 U.S.C. § 1252(a)(1). Thus, Dai is the petitioner, not the appellant, and the Attorney General is the respondent, not the appellee. A provision that applies "on appeal" therefore does not apply

---

[8] The proper application of the rebuttable presumption provision is apparent in *She v. Holder*, 629 F.3d 958 (9th Cir. 2010). In that case, we quoted a different pre-REAL ID rule: that "[a]bsent an adverse credibility finding, the BIA is required to 'presume the petitioner's testimony to be credible.'" *Id.* at 964 (quoting *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 662 (9th Cir. 2003)). In a footnote, we acknowledged that the REAL ID Act prospectively altered this rule so that the BIA must only afford "a *rebuttable* presumption of credibility" when the IJ does not make an adverse credibility finding. *Id.* at 964 n.5. Thus, while the dissent is correct that the REAL ID Act affected our precedent, it did not disturb the distinct rule upon which we rely in this case: that in the absence of an adverse credibility finding by either the IJ or the BIA, we are required to treat the petitioner's testimony as credible.

to our review, but solely to the BIA's review on appeal from the IJ's decision.[9]

The inapplicability of the rebuttable presumption provision to review in this court is further confirmed by a fundamental distinction between appellate review and review of administrative decisions that the dissent ignores. When we review a decision of a district court, we may "affirm on any ground supported by the record even if the district court did not consider the issue." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 (9th Cir. 2007). When we review an administrative decision, however, "we cannot deny a petition for review on a ground [on which] the BIA itself did not base its decision." *Hernandez-Cruz*, 651 F.3d at 1110; *see also Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 688 (9th Cir. 2007).

The dissent is therefore incorrect to say that "[w]hen it comes to our task of reviewing the credibility of witnesses in a trial court or whether a witness' testimony suffices to carry his burden of proof [ ] there is no material difference between an appeal and a petition for review." Dissent at 38. In an appeal we may, in appropriate circumstances and after affording appropriate deference, reject a district court's credibility finding (whether favorable or adverse) in order to affirm the district court on an alternative ground. However, when the BIA has on appeal neither affirmed an adverse credibility finding made by the IJ nor made its own finding after deeming the presumption of credibility rebutted, we may

---

[9] The fact that appeals and petitions for review are treated the same for purposes of the Federal Rules of Appellate Procedure, *see* Fed. R. App. P. 20; Dissent at 38–39, is irrelevant. The provision in question, 8 U.S.C. § 1158(b)(1)(B)(iii), is not part of the those rules.

not deny the petition for review based on lack of credibility, not only because under our well-established case law we must deem the petitioner's testimony credible but also because a denial on that ground would require us to adopt a justification not relied on by the BIA.

The plain text and context of the statute dictate the conclusion that the REAL ID Act's rebuttable presumption of credibility applies only on appeal to the BIA. In the absence of any other provision in the Act affecting the procedures governing credibility findings,[10] our rule that we are required to treat a petitioner's testimony as credible when the agency does not make an adverse credibility finding remains applicable. Because neither the IJ nor the BIA made an adverse credibility determination in Dai's case, we must treat his testimony as credible.

## B.  Sufficiency

Because Dai's testimony must be deemed credible, we must next consider whether he testified to facts sufficient to establish eligibility for asylum. By statute, "a person . . . who has been persecuted for failure or refusal to [abort a pregnancy or to undergo involuntary sterilization] or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion." 8 U.S.C. § 1101(a)(42). The harm Dai suffered was

---

[10] The only other significant change regarding credibility adopted by the REAL ID Act is the rule that an adverse credibility finding may now be based on "an inconsistency, inaccuracy, or falsehood [that does not go] to the heart of the applicant's claim." 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C). That rule is irrelevant to this case, as the IJ and BIA did not make an adverse credibility finding.

on account of his resistance to China's coercive population control program and thus was on the basis of a protected ground. In addition, "[p]olice officers are the prototypical state actor for asylum purposes." *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1088 (9th Cir. 2005). Therefore, the only question as to the sufficiency of Dai's testimony is whether the harm rose to the level of persecution.

Dai testified that he was beaten, arrested, detained, and deprived of food and sleep because of his attempt to oppose his wife's involuntary abortion. "It is well established that physical violence is persecution." *Li v. Holder*, 559 F.3d 1096, 1107 (9th Cir. 2009). In *Guo v. Ashcroft*, 361 F.3d 1194 (9th Cir. 2004), this court held that facts similar to—but less serious than—the facts in this case compelled a finding of persecution. The applicant in *Guo* was arrested, detained for a day and a half, punched in the face, and kicked in the stomach. *Id.* at 1202–03. In contrast, Dai was forcibly pushed to the ground twice, repeatedly punched in the stomach while handcuffed, jailed for ten days, fed very little food and water, deprived of sleep through interrogation, and denied medical care. An applicant may establish persecution through physical abuse even if he does not seek medical treatment, *see Lopez v. Ashcroft*, 366 F.3d 799, 803 (9th Cir. 2004), but Dai did seek and receive such treatment for an injured shoulder and broken ribs.

In addition to the physical harm he suffered, Dai lost his job as a result of this occurrence. Such economic harm can contribute to a finding of persecution. *See Vitug v. Holder*, 723 F.3d 1056, 1065 (9th Cir. 2013).

For these reasons, the harm Dai suffered rose to—and indeed, well surpassed—the established level of persecution.

The record therefore compels the conclusion that Dai's testimony sets forth sufficient specific facts to constitute past persecution.

### C. Persuasiveness

The BIA did not make an adverse credibility finding, but instead found that Dai had failed to "meet[] his burden of proving his asylum claim." As we have explained, *see* pages 13–14, *supra*, an applicant's testimony carries the burden of proof if it is credible, persuasive, and sufficient. Two of those requirements have been satisfied: we must treat Dai's testimony as credible and his testimony clearly set out sufficient facts to establish past persecution. We therefore treat the BIA's general statement about Dai's burden of proof as relating to the only remaining requirement for testimony to carry that burden: persuasiveness. However, taking into account the record as a whole, nothing undermines the persuasiveness of Dai's credible testimony—that is, the BIA's determination that Dai's testimony was unpersuasive is not supported by substantial evidence.

In evaluating persuasiveness the BIA is required to "weigh the credible testimony along with other evidence of record." 8 U.S.C. § 1158(b)(1)(B)(ii). The BIA found that Dai's testimony was not persuasive for two reasons. First, the record revealed that Dai's wife Qin and their daughter had traveled to the United States with Dai, and then voluntarily returned to China. Second, Dai initially tried to conceal this fact from the asylum interviewer until he was confronted with it. According to the BIA, "[t]he respondent's family voluntarily returning and his not being truthful about it is detrimental to his claim and is significant to his burden of proof." The IJ identified a third reason for not finding Dai's

testimony persuasive: the fact that when asked for "the real story about you and your family's travel to the U.S.," Dai responded, "I wanted a good environment for my child. My wife had a job and I didn't, and that is why I stayed here. My wife and child go home first." However, none of these reasons supports the BIA's conclusion that Dai's testimony was not persuasive in light of the record as a whole.

We have held that a noncitizen's "history of willingly returning to his or her home country militates against a finding of past persecution or a well-founded fear of future persecution." *Loho v. Mukasey*, 531 F.3d 1016, 1017–18 (9th Cir. 2008). The BIA relied heavily on *Loho* to justify its decision. However, unlike in *Loho*, Dai never returned to China—only his wife and daughter did.

We have also recognized that a family member's voluntary return—or demonstrated ability to remain in the country without further injury—can be relevant in certain narrow circumstances: when the applicant's "fear of future persecution rests *solely* upon threats received by his family," *Tamang v. Holder*, 598 F.3d 1083, 1094 (9th Cir. 2010) (emphasis added), or when the family member and the applicant are "similarly situated," *Sinha v. Holder*, 564 F.3d 1015, 1022 (9th Cir. 2009).

The IJ found that "the fundamental thrust of [Dai's] claim is that his wife was forced to have an abortion," and Qin "therefore clearly has an equal, or stronger, claim to asylum than [Dai] himself." The IJ also found that Qin was "the primary object of the persecution in China." The BIA adopted this reasoning. However, the findings are contrary to the reasoning of our case law.

It is true that Dai and Qin's persecution arose out of the same general event, but that is not the test that *Tamang* and *Sinha* establish. Dai's fear of persecution does not "rest solely" on Qin's treatment, and Dai and Qin are not "similarly situated." As the harms suffered by Dai and Qin in the past are qualitatively different and give rise to different fears about future persecution, we need not decide who has the "stronger" claim. Neither the statutes nor our case law endorses the IJ and BIA's approach of ranking distinct harms. To the contrary, Dai's claim is independently established by statute and is not dependent on any comparison with Qin's.[11]

Qin's hypothetical asylum claim arises out of the invasive medical procedure imposed on her against her will—she was "forced to abort a pregnancy [and] to undergo involuntary sterilization." 8 U.S.C. § 1101(a)(42). We certainly agree with the BIA and the government that interference with a person's reproductive freedom is a severe form of persecution and in no way do we suggest that Qin would not have a strong case for asylum had she applied for it.

Dai, however, was "persecuted . . . for [ ] resistance to a coercive population control program." *Id.* He was subjected to beatings, prolonged detention, and deprivation of food and sleep—none of which was experienced by Qin. After the incident, Dai was fired from his job while Qin was only demoted. In addition, Qin had already been subjected to the involuntary insertion of an IUD, whereas Dai fears future involuntary sterilization. Since Qin returned to China she has

---

[11] "For purposes of determinations under this chapter, a person . . . who has been persecuted for . . . resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion." 8 U.S.C. § 1101(a)(42).

apparently not faced further persecution, but the police have come looking for Dai several times. Dai and Qin's past experiences, as well as their fears about the future, are therefore not so similar as to support the BIA's finding that Qin's voluntary return to China undermines Dai's claim for asylum.

Moreover, Dai's and Qin's respective decisions make sense in context. Qin still had a job in China, and their daughter had a place in school—albeit not in as good a school as she deserved. In this context, it was entirely reasonable to think that the family would be best off if Qin returned to China to keep her job while Dai attempted to establish himself in the United States—hoping that, once he did so, his family would be able to join him. The BIA improperly substituted its own view of what the members of the family should have done for Dai and Qin's own reasoned judgment in a manner that is not supported by substantial evidence in the record.

The BIA's second reason for finding Dai's testimony unpersuasive fares no better. The BIA held that even in the absence of an adverse credibility finding, Dai "not being truthful" about his family's travel to the United States and voluntary return to China "is detrimental to his claim and is significant to his burden of proof."

The BIA's framing of the issue suggests that it is relevant because it casts doubt on Dai's credibility. However, the exercise in which we engage when evaluating persuasiveness requires that in this case we treat Dai's testimony before the IJ as credible. Other evidence is relevant only to the extent that it affects the persuasiveness of the applicant's testimony for reasons *other* than challenging his credibility. Otherwise,

the statutory command to "weigh the *credible* testimony along with *other* evidence of record," 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added), would not make sense. Once credibility is decided—here, as we have explained, by the failure of the IJ or the BIA to make an adverse credibility finding—the issue is settled. Credibility concerns that do not justify an adverse credibility finding cannot be smuggled into the persuasiveness inquiry so as to undermine the finding of credibility we are required to afford Dai's testimony.[12] Indeed, despite pointing out that Dai was "not [ ] truthful" about a tangential point, the BIA never questioned the facts regarding Dai's persecution in China.

Neither the IJ nor the BIA explained how Dai's concealment of his family's travel to the United States and return to China was relevant in any way other than to undermine Dai's credibility. The government likewise offered no such explanation before this court, and in any event we independently discern no relevance beyond Dai's credibility. Therefore, neither the family's return nor Dai's alleged concealment of that fact can support the BIA's finding that Dai's credible testimony was unpersuasive.

Finally, contrary to the portion of the IJ's opinion not mentioned by the BIA, Dai's statement that "My wife had a job and I didn't, and that is why I stayed here," does not

---

[12] According to the dissent, "there is barely a dime's worth of substantive difference between 'credible' and 'persuasive.'" Dissent at 45. This assertion is flatly contradicted by the text of the REAL ID Act, which requires that testimony be both "credible" *and* "persuasive." 8 U.S.C. § 1158(b)(1)(B)(ii). "It is a well-established rule of statutory construction that courts should not interpret statutes in a way that renders a provision superfluous." *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 966 (9th Cir. 2013).

render his testimony about his past persecution unpersuasive. A valid asylum claim is not undermined by the fact that the applicant had additional reasons (beyond escaping persecution) for coming to or remaining in the United States, including seeking economic opportunity. *See Li*, 559 F.3d at 1105 (reversing an adverse credibility determination that was based on an applicant's testimony that economic opportunity was an additional reason for coming to the United States). That is especially true when, as in this case, the loss of economic opportunity in the home country is part of the overall persecution. Dai testified about his reasons for coming to the United States: "I was persecuted in China . . . . I was arrested. I was beaten[]. I lost my job. . . . I want to come here [ ] and have my very basic human rights." Although Dai acknowledged that he had *additional* reasons for coming to the United States, he never recanted or contradicted his assertion that he feared persecution if he returned to China, which is the only subjective requirement for an asylum claim.

* * *

The BIA did not enter an adverse credibility finding, so we are required to treat Dai's testimony as credible. The record compels the conclusion that he testified to sufficient facts to demonstrate his eligibility for asylum: he was subjected to harm rising to the level of persecution, that persecution was on account of a protected ground, and the persecution was committed by the government. Nothing in the BIA's burden of proof analysis raises questions about whether Dai established either of those elements. Treating that analysis instead as going to the question of persuasiveness, the BIA's concerns are either unsupported by our case law or serve only as attempts to impermissibly undermine the credibility determination. The record therefore

compels the conclusion that Dai's testimony satisfies his burden of proof because it meets the three requirements of the statute: it is credible, persuasive, and sets forth sufficient facts. 8 U.S.C. § 1158(b)(1)(B)(ii).

Because Dai has established that he suffered past persecution, he is entitled to a presumption of a well-founded fear of future persecution. During the administrative proceedings, DHS

> made no arguments concerning changed country conditions to the IJ or the BIA, and presented no documentary evidence for that purpose. "In these circumstances, to provide [DHS] with another opportunity to present evidence of changed country conditions, when it twice had the chance but failed to do so, would be exceptionally unfair."

*Ndom v. Ashcroft*, 384 F.3d 743, 756 (9th Cir. 2004) (quoting *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 n.11 (9th Cir. 2004)); *see also Quan v. Gonzales*, 428 F.3d 883, 889 (9th Cir. 2005). "In this situation, we are not required to remand for a determination of whether [Dai] is eligible for asylum. We hold that he is eligible for asylum. Because the decision to grant asylum is discretionary, however, we remand for a determination of whether [Dai] should be granted asylum." *Ndom*, 384 F.3d at 756 (citations omitted).

## II. Withholding of Removal

Withholding of removal is governed by the same standards as asylum for demonstrating credibility, sufficiency, and persuasiveness. *Compare* 8 U.S.C.

§ 1158(b)(1)(B)(ii), (iii), *with* § 1229a(c)(4)(B), (C). The primary difference is that, in order to be eligible for withholding, Dai must demonstrate that "it is more likely than not that he would be subjected to persecution" based on a protected ground if removed to China, a higher standard than the well-founded fear required for asylum. *Zhang v. Ashcroft*, 388 F.3d 713, 718 (9th Cir. 2004) (quotation marks omitted). However, as with asylum, past persecution gives rise to a presumption of a sufficient likelihood of future persecution. *Mutuku v. Holder*, 600 F.3d 1210, 1213 (9th Cir. 2010); *Tamang*, 598 F.3d at 1091; *Mousa v. Mukasey*, 530 F.3d 1025, 1030 (9th Cir. 2008); *Hanna v. Keisler*, 506 F.3d 933, 940 (9th Cir. 2007); 8 C.F.R. § 1208.16(b)(1)(i).

The record compels the conclusion that Dai has established past persecution for his withholding claim for the same reasons as for his asylum claim. The government presented no evidence of changed country conditions, nor did it argue that the resulting presumption has been rebutted or that Dai is barred from withholding of removal for any reason. We therefore remand with instructions to grant Dai withholding of removal. *See Ndom*, 384 F.3d at 756.[13]

## CONCLUSION

The dissent is correct that our "role in an immigration case is typically one of review, not of first view." *Gonzales v. Thomas*, 547 U.S. 183, 185 (2006) (quotation marks omitted). It is the dissent, however, that violates this cardinal rule. We do not doubt that our dissenting colleague could have written a more persuasive opinion on behalf of the BIA

---

[13] Dai does not challenge the BIA's denial of CAT relief here, so we do not consider it.

denying relief to Dai, but that is not the role of this court. We are limited to reviewing the reasoning actually advanced by the agency and we cannot substitute our own rationales for those it relied on. Here, neither the IJ nor the BIA made an adverse credibility finding, no matter how much the dissent wishes that they had.[14]

Dai's petition for review is **GRANTED** and this case is **REMANDED** to the BIA for the exercise of its statutory discretion and to grant withholding of removal.

---

[14] With all respect, Judge Trott's lengthy laments regarding the need for the IJ and the BIA to state explicitly that they find a petitioner's testimony not credible are wholly unwarranted. Such has been the law for at least two decades. It is not difficult for an IJ or the BIA to follow that rule: the agency need only include a few words in its decision. When it fails to do so, we can only assume that the failure is deliberate. In any event, the agency's failure in a particular case to make a required finding would hardly warrant Judge Trott's extraordinary discourse regarding our circuit's immigration law in general. In short, the problem which so greatly disturbs Judge Trott is of little moment. At most, he has shown that on occasion the agency has failed to do its job properly. If he's right, then surely it will do better in the future.

TROTT, Circuit Judge, dissenting:

The significance of my colleagues' opinion is not that it remands this case to the Bureau of Immigration Appeals ("BIA") with orders favorable to Ming Dai. In the abstract, this result would be unremarkable. However, the serious legal consequences of their opinion as a circuit precedent are that it (1) demolishes both the purpose and the substance of the REAL ID Act of 2005 ("Act")[1], (2) disregards the appropriate standard of review, and (3) perpetuates our idiosyncratic approach to an Immigration Judge's ("IJ") determination that the testimony of an asylum seeker lacks sufficient credibility or persuasiveness to prove his case. The majority's opinion accomplishes these untoward results by contaminating the issue before us with irrelevancies, the most pernicious of which is a meritless irrebuttable presumption of credibility. The sole issue should be whether Dai's unedited presentation *compels* the conclusion that he carried his burden of proving he is a refugee and thus eligible for a discretionary grant of asylum. Only if we can conclude that no reasonable factfinder could fail to find his evidence conclusive can we grant his petition.

The IJ's decision not to make an explicit adverse credibility finding is a classic red herring that throws our analysis off the scent and preordains a result that is incompatible with the evidentiary record. By omitting from their opinion the IJ's fact-based explanation of his decision, the majority elides and obscures *eight* material findings of fact the IJ *did* make, each of which is entitled to substantial deference. The majority's artificial assertion that "there is no finding to which we can defer" is false. For this reason, I

---

[1] Pub. L. No. 109-13, 119 Stat. 231.

quote in full the IJ's findings and conclusions about the persuasiveness of Dai's presentation in Part IV of my dissent. The eight findings are as follows.

First, the IJ specifically found that the information reported by the asylum officer about his conversation with Dai was accurate. The IJ said,

> As to the contents of [the asylum officer's notes], I give the notes full weight, insofar as the respondent has confirmed the contents of the questions and answers given during the course of that interview. Furthermore, I note that in the sections in which the respondent equivocated, stating that he was nervous and not sure that he gave those precise answers, I nevertheless give the Asylum Officer's notes some substantial weight, in that they are consistent with the respondent's testimony in court.

Accordingly, the IJ accepted as a fact that Dai *admitted* that he did not disclose the consequential truth about his wife's and daughter's travels because he was nervous about how this would be perceived by the asylum officer in connection with his claim.

Second, the IJ accepted Dai's admission as a fact that he concealed the truth because he was afraid of giving straight answers regarding his wife's and daughter's trip to the United States.

Third, the IJ determined that Dai had deliberately omitted highly relevant information from his Form I-589 application

for asylum, information that he also tried to conceal from the asylum officer.

Fourth, the IJ found that Dai's omission of his information "is consistent with his lack of forthrightness before the asylum office[r] as to his wife and daughter's travel with him. . . ."

Fifth, the IJ credited Dai's admission that when asked by the asylum officer to "tell the real story" about his family's travels, Dai said he "wanted a good environment for his child, and his wife had a job, but he did not, and that is why he stayed here [after his wife and daughter went back to China].

Sixth, the IJ found that Dai admitted he stayed here after they returned "because he was in a bad mood and he wanted to get a job and 'a friend of mine is here.'"

Seventh, the IJ said "I do *not* find that [Dai's] explanations for [his wife's] return to China while he remained here are adequate." (Emphasis added).

Finally, the IJ also credited Dai's concessions that his wife and daughter returned to China because "his daughter's education would be cheaper in China," and that "his wife wanted to go to take care of her father."

When Dai's subterfuge got to the BIA, the BIA said in its decision that "the record reflects that [Dai] failed to disclose to both the asylum officer and the IJ" the true facts about his family's travels. The BIA noted that Dai had conceded he was not forthcoming about this material information because he believed that the truth about their travels "would be

perceived as inconsistent with his claims of past and feared persecution."

The IJ's specific factual findings in connection with Dai's failure to satisfy his burden of proof were not the product of inferences drawn from circumstantial evidence. These findings were directly based upon revealing answers Dai *admitted* he gave to the asylum officer during his interview. These facts are beyond debate, and they undercut Dai's case. To quote the BIA, these facts were "detrimental to his claim" and "significant to his burden of proof." Nevertheless, the majority cavalierly brushes them aside, claiming that an immaterial presumption of credibility overrides all of them.

In this connection, I note a peculiarity in the majority's approach to Dai's case: Nowhere does Dai assert that he is entitled to a conclusive presumption of credibility. His brief does not contain any mention of the presumption argument the majority conjures up on his behalf. The closest Dai comes to invoking the majority's inapt postulate is with a statement that we "should" treat as credible his testimony regarding persecution in China. He does not take issue with the IJ's foundational adverse factual findings, choosing instead to argue that they were not sufficient in the light of the record as a whole to support the IJ's ultimate determination.

For example, Dai acknowledges in his brief that the "IJ's or BIA's factual findings are reviewed for substantial evidence" and that the "REAL ID Act's new standards *governing adverse credibility determinations* applies to applications for asylum, withholding of removal, and CAT relief made on or after May 11, 2005." Blue Br. 10 (emphasis added) (quotation marks omitted). Next, he notes

that "an IJ cannot selectively examine evidence in determining *credibility*, but rather must present a reasoned analysis of the *evidence as a whole* and cite specific instances in the record that *form the basis of the adverse credibility finding*." *Id.* (emphasis added) (quotation marks omitted). Moreover, Dai notes that "[t]o support *an adverse credibility determination*, inconsistencies must be considered in light of the *totality of the circumstances*, and all relevant factors" adding that "trivial inconsistencies . . . should not form the basis of *an adverse credibility determination*." *Id.* at 10–11 (emphasis added) (quotation marks omitted). He contends that he "has provided adequate explanation" for his inconsistencies, *i.e.*, the failure to disclose his family's travels. *Id.* at 14. Finally, after attempting to pick apart the IJ's adverse findings, Dai's bottom line is that "his wife's departure from the United States does not adversely affect his credibility at all," an assertion that ignores his failed coverup of it. *See id.* at 16.

In summary, the majority choose to ignore a material part of the evidentiary record even though Dai implores us to "examine it as a whole," as he did in his brief to the BIA. Dai accepts that the viability of his *entire* presentation is on the line, but the majority ignores his concession. In this connection, the Attorney General has responded only to the claims and arguments Dai included in his brief. The Attorney General has not been given an opportunity to respond to the majority's inventive analysis, nor to the theory concocted by the majority on Dai's behalf. Both sides will be surprised by my colleagues' artful opinion—Dai pleasantly, the Attorney General not so much.

I will have more to say in Part V about our Circuit's misinformed treatment of the role, responsibility, and product of an asylum officer.

For these reasons, I respectfully dissent.

# I

## Backdrop

Over the years, our Circuit has manufactured a plethora of misguided rules regarding the credibility of political asylum seekers.  I begin with this issue because the majority's mishandling of it infects the remainder of their opinion with error.  These result-oriented ad hoc hurdles for the government stem from humanitarian intentions, but our court has pursued these intentions with untenable methods that violate the institutional differences between a reviewing appellate court, on one hand, and a trial court on the other, usurping the role of the Department of Homeland Security ("DHS") and the BIA in the process.  Referring to our approach to witness credibility as an "idiosyncratic analytical framework," a previous panel of our court described this inappropriate situation as follows:

> The Supreme Court has repeatedly instructed us on the proper standard to apply when reviewing an immigration judge's adverse credibility determination.  Time and again, however, we have promulgated rules that tend to obscure that clear standard and to flummox immigration judges, who must contort what should be a simple factual finding to satisfy our often irreconcilable precedents.  The

result of this sly insubordination is that a panel that takes Congress at its word and accepts that findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude the contrary," . . . or follows the Supreme Court's admonition that "[t]o reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it," . . . runs a serious risk of flouting one of our eclectic, and sometimes contradictory, opinions.

*Jibril v. Gonzales*, 423 F.3d 1129, 1138 (9th Cir. 2005) (alteration in original) (citations omitted).

Many of our Circuit's contrived rules on this subject and my colleagues' decision are irreconcilable with the structural principle set forth in Federal Rule of Civil Procedure 52(a)(6) that "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Accordingly, we are expected to apply a highly deferential standard to a trial court's determination regarding the credibility of a witness. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–76 (1985). In discussing this rule, the Supreme Court said that "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575. The Court added that the applicable "clearly erroneous" standard of review "plainly does not entitle a *reviewing* court to

reverse the finding of a trier of fact simply because it is convinced that it would have decided the case differently. The *reviewing* court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court." *Id.* at 573 (emphasis added).

The Supreme Court sharpened this point about our limited role in *Gonzales v. Thomas*, 547 U.S. 183 (2006) (per curiam), *vacating* 409 F.3d 1177 (9th Cir. 2005) (en banc). In summarily vacating our obdurate en banc opinion, the Court held that we had exceeded our authority and made a determination that belonged to the BIA. 547 U.S. at 185–86. The Court agreed with the Solicitor General that "a court's role in an immigration case is typically *one of review, not of first view*." *Id.* at 185 (emphasis added) (quotation marks omitted). To support its conclusion, the Court cited *INS v. Orlando Ventura*, 537 U.S. 12 (2002): a "'judicial judgment cannot be made to do service for an administrative judgment.'" 547 U.S. at 186 (quoting *Ventura*, 537 U.S. at 16). More about *Ventura* later.

The majority's opinion's use of an incongruous irrebuttable presumption of credibility to erase the IJ's findings of fact and the BIA's decision and thus to make us a court of "first view" is another example of our continuing intransigence. If, as they say, we are bound by precedent to do it their way, then its time to change our precedent.

# II

## A False Premise

### A.

The majority opinion's assertion that "we must treat [Dai's] testimony as credible" rests on a fallacious premise. Judge Reinhardt writes, "Properly understood, the rebuttable presumption provision of the REAL ID Act applies only to appeals to the BIA, not to petitions for review in our court." From this defective premise, he concludes that we *must* ignore the IJ's detailed analysis and findings of fact about Dai's presentation. When it comes to our task of reviewing the credibility of witnesses in a trial court or whether a witness' testimony suffices to carry his burden of proof, however, there is no material difference between an appeal and a petition for review, none. Federal Rule of Civil Procedure 52(a) makes no such distinction. As *Anderson* said, Rule 52(a) applies to a "*reviewing* court," which is what we are in this capacity. 470 U.S. at 573–74 (emphasis added); *see Thomas*, 547 U.S. at 185. Neither the Court nor Rule 52(a) differentiate between appeals and petitions for review. Nor would such a distinction make any sense. As *Anderson* and *Thomas* illustrate, the issue is one of *function*, not of form or labels. The Act's use of the word "appeal" does not dictate how we must go about our process of review. Using the standards provided by Congress, we are not in a position to weigh a witness's credibility or persuasiveness.

Federal Rule of Appellate Procedure 20, "Applicability of Rules to the Review or Enforcement of an Agency Order," illustrates the soundness of treating appeals and petitions for review with a uniform approach. Rule 20 reads, "All

provisions of these rules . . . apply to the review or enforcement of an agency order. In these rules, 'appellant' includes a petitioner or applicant, and 'appellee' includes a respondent."

Moreover, and directly to the point, the Act itself does *not* require an IJ to make a specific credibility finding in those precise terms. As the BIA correctly said with respect to the Act, "[c]ontrary to the respondent's argument on appeal, the Immigration Judge need not have made an explicit adverse credibility finding to nevertheless determine that the respondent did not meet his burden of proving his asylum claim." *See* discussion *infra* Section VI. If the IJ does not make such an explicit finding, all the respondent is entitled to is a "*rebuttable* presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added). By attempting to restrict this language to an appeal *to the BIA*, the majority opinion conveniently frees itself to apply derelict Ninth Circuit precedent to Dai's testimony and automatically to deem it credible.[2]

Over and over the majority incant an inappropriate and counterintuitive rule that in the absence of a formal adverse credibility finding, "we are required [blindly] to treat the petitioner's testimony as credibility." The practical effect of the majority's rule is breathtaking: The *lack* of a formal adverse credibility finding becomes a selective positive credibility finding and dooms a fact-based determination by an IJ and the BIA that an applicant's case is not sufficiently

---

[2] The majority cites *She v. Holder*, 629 F.3d 958, 964 & n.5 (9th Cir. 2010) in support of this ipse dixit claim. However, *She*'s footnote 5 says that because the "rebuttable presumption" provision does not apply retroactively, it had no applicability in *She*'s case.

persuasive to carry his burden of proof. The majority's bizarre cherry-picking approach violates all the rules that control our review of a witness's testimony before a factfinder.

**B.**

But even if we were to assume for the sake of argument that the Act's rebuttable presumption applies only to the BIA, by what logic, reason, or principle does it follow that *we* as a reviewing court are free to clothe an applicant's testimony with a protective presumption of credibility? Are we free to turn a blind eye to conspicuous problems with his testimony identified by an IJ? By the BIA? Free to brush off Rule 52(a) and the Supreme Court's explanation of what the Rule requires?

A conclusive presumption of credibility has no valid place in our task of reviewing the persuasiveness of a witness's testimony. Such an artifice vacuously eliminates relevant factual evidence from consideration and violates Rule 52(a)(6). The deployment of a conclusive presumption becomes a misguided way not only of putting a heavy thumb on one tray of the traditional scales of justice, but also of removing relevant evidence from the other. This approach allows us to evade our responsibilities to examine and to evaluate the *entire* record before an IJ, permitting us instead to disregard facts that would otherwise discredit our final determination.

Judge Reinhardt's opinion writes the REAL ID Act and its reference to a *rebuttable* presumption of credibility out of existence. However, Congress specifically intended the Act to govern *us*, the Ninth Circuit Court of *Appeals*, as

demonstrated in Section III of this dissent. The evidentiary record in this case devours any such presumption.

Judge Reinhardt's claim that a petition for review is "a new action against the United States" is irrelevant. No matter what he calls it, we are *reviewing* a decision made by an administrative agency involving the persuasiveness of his case.

## III

### The REAL ID Act

Congress enacted the REAL ID Act of 2005 because of our Circuit's outlier precedents on this issue and our intransigent refusal to follow the rules. The House Conference Committee Report ("House Report")[3] explained that "the creation of a uniform standard for credibility is needed to address a conflict . . . between the Ninth Circuit on one hand and other circuits and the BIA." H.R. Rep. No. 109-72 at 167. The House Report also said that the Act "resolves conflicts between administrative and judicial tribunals with respect to standards to be followed in assessing asylum claims." *Id.* at 162. Nevertheless, my colleagues hold that a key part of the Act does not apply to us, only to the BIA.

As the Act pertains to this case, it established a number of key principles, all of which the majority fails to follow, perpetuating the conflicts Congress attempted to resolve.

---

[3] H.R. Rep. No. 109-72 (2005) (Conf. Rep.), *reprinted in* 2005 U.S.C.C.A.N. 240.

First, "[t]he burden of proof is on the applicant to establish that the applicant is a refugee . . . ."**⁴**

Second, "[t]he testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant *satisfies the trier of fact* that the applicant's testimony is credible, is *persuasive*, and refers to specific facts sufficient to demonstrate that the applicant is a refugee."**⁵**

Third,

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or

---

⁴ 8 U.S.C. § 1158(b)(1)(B)(i).

⁵ 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added).

falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.[6]

We have attempted in a number of panel opinions after the Act to calibrate our approach to applicant credibility and persuasiveness issues, but as the majority opinion illustrates, "old ways die hard." *Huang v. Holder*, 744 F.3d 1149 (9th Cir. 2014) captures where we should be on this issue:

[W]e have concluded that "the REAL ID Act requires a healthy measure of deference to agency credibility determinations." This deference "makes sense because IJs are in the best position to assess demeanor and other credibility cues that we cannot readily access on review." "[A]n immigration judge alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence." By virtue of their expertise, IJs are "uniquely qualified to decide whether an alien's testimony has about it the ring of truth."

The need for deference is particularly strong in the context of demeanor assessments. Such

---

[6] 8 U.S.C. § 1158(b)(1)(B)(iii).

determinations will often be based on non-verbal cues, and "[f]ew, if any, of these ephemeral indicia of credibility can be conveyed by a paper record of the proceedings and it would be extraordinary for a reviewing court to substitute its second-hand impression of the petitioner's demeanor, candor, or responsiveness for that of the IJ." Indeed, even before the enactment of the REAL ID Act, we recognized the need to give "special deference to a credibility determination that is based on demeanor," because the important elements of a witness's demeanor that "may convince the observing trial judge that the witness is testifying truthfully or falsely" are "entirely unavailable to a reader of the transcript, such as the Board or the Court of Appeals." The same principles underlie the deference we accord to the credibility determinations of juries and trial judges.

*Id.* at 1153–54 (alterations in original) (citations omitted). This "healthy measure of deference" should also apply to the agency's determination with respect to whether an applicant has satisfied the agency's "*trier of fact*"—*not us*—that his evidence is persuasive, an issue that is in the wheelhouse of a jury or a judge or an IJ hearing a case as a factfinder.

# IV

## The IJ's Decision

The IJ in this case concluded that Ming Dai had not satisfied his statutory burden of establishing that he is a refugee pursuant to § 1158(b)(1)(B)(i). The IJ gave as his "principle area of concern" Dai's implausible unpersuasive testimony, another way of saying it wasn't credible. As Dai's brief correctly demonstrates, there is barely a dime's worth of substantive difference between "credible" and "persuasive." Here is how the IJ explained his decision in terms of § 1158(b)(1)(B)(i) and (ii):

> I have carefully considered the respondent's testimony and evidence and for the following reasons, I find that the respondent has failed to meet his burden of proving eligibility for asylum.
>
> The principal area of *concern with regard to the respondent's testimony* arose during the course of his cross-examination. On cross-examination, the respondent was asked about various aspects of his interview with an Asylum Officer. The Department of Homeland Security also submitted the notes of that interview as Exhibit 5. The respondent was asked specific questions regarding several aspects of his testimony before the Asylum Officer. In the course of cross-examination, the respondent was asked regarding his questions and answers as to whether his wife and daughter travelled with him to the United

States. The respondent's responses included
the question of whether the asylum officer had
asked him if his wife and daughter travelled
anywhere other than to Taiwan and Hong
Kong. The respondent conceded that he was
asked this question and that he replied yes,
they had travelled to Taiwan and Hong Kong.
The respondent was asked whether the
Asylum Officer inquired whether his wife and
daughter had travelled elsewhere. The
respondent then testified before the Court that
he was asked this question, "but I was
nervous." In this regard, I note that the
respondent did not directly answer the
question; instead leapt directly to an
explanation for what his answer may have
been, namely that he was nervous. The
respondent was then asked specifically
whether the Asylum Officer asked him if his
wife had travelled to Australia in 2007. The
respondent confirmed that he had been asked
this question, and he confirmed that the
answer was in the affirmative. The
respondent also confirmed that the Asylum
Officer had asked him whether she had
travelled anywhere else. He confirmed that he
had been so asked. The respondent was then
asked whether he answered "no," that she had
not travelled anywhere else. The respondent
answered that he believed so, that he had so
answered. The respondent was then asked,
during the course of cross-examination, why
he had not said to the Asylum Officer that yes,
she had travelled to the United States. The

respondent replied that he had not thought of it. He stated that they did come with him (meaning his wife and daughter) and that he thought the Asylum Officer was asking him if they had travelled anywhere other than the United States. He explained that he did so because he assumed the U.S. Government had the records of their travel to the United States. On further questioning, the respondent eventually hesitated at some length when asked to further explain why he did not disclose spontaneously to the Asylum Officer that his wife and daughter had come with him. The respondent paused at some length and I observed that the respondent appeared nervous and at a loss for words. However, after a fairly lengthy pause, the respondent testified that he is afraid to say that his wife and daughter came here and why they went back. The respondent was asked whether he told the Asylum Officer that he was afraid to answer directly. The respondent initially testified that he forgot and did not remember whether he said that. He again reiterated that he was very nervous. He was then asked the question again as to whether he told the Asylum Officer that he was afraid to answer why his wife and daughter had gone back. He then conceded that maybe, yes, he had answered in that fashion. The respondent was asked whether the Asylum Officer inquired why his wife and daughter went back, and the respondent conceded that he had been so asked, and he further conceded that he replied

because school in the United States cost a lot
of money (referring to the schooling for his
daughter).  The respondent was then asked to
confirm that the Asylum Officer eventually
asked him to tell him the real story as to why
his family travelled to the United States and
returned to China.  The respondent confirmed
that he was asked this question and when
asked, whether he replied that it was because
he wanted a good environment for his child
and because his wife had a job and he did not
and that that is why he stayed here.  He
confirmed that he did, in fact, say that.  The
respondent was further asked, during the
course of testimony in court, why his wife and
daughter returned to China.  In this regard, the
respondent testified that they came with him,
but returned to China several weeks after
arrival.  He testified that they did so because
his father-in-law was elderly and needed
attention, and because his daughter needed to
graduate school in China.

The respondent further claimed that his wife
had, in fact, suffered past persecution in the
form of a forced abortion and the respondent
confirmed that he feared his wife and
daughter would suffer future persecution.  In
this regard, the respondent qualified his
answer by saying that his wife was now on an
IUD, apparently thereby suggesting that the
risk of persecution is reduced.  However, the
respondent did concede that the risk of future
persecution also pertains to his daughter.

Indeed, in this regard, the respondent testified that this is, at least in part, why he applied for asylum.

*As to the contents of Exhibit 5, I give the notes full weight, insofar as the respondent has confirmed the contents of the questions and answers given during the course of that interview. Furthermore, I note that in the sections in which the respondent equivocated, stating that he was nervous and not sure that he gave those precise answers, I nevertheless give the Asylum Officer's notes some substantial weight, in that they are consistent with the respondent's testimony in court.* Specifically, I note that the Asylum Officer's notes state that the respondent ultimately indicated that he was afraid of giving straight answers regarding his daughter and wife's trip to the United States and return to China. And while the respondent did not confirm this in court, he did give a similar answer as to why he was testifying in this regard. In other words, the respondent appears to have stated, both before the Asylum Officer and in court that he did not spontaneously disclose the travel of his wife and daughter with him to the United States and their return because *he was nervous about how this would be perceived by the Asylum Officer in connection with his claim*. I further note that the Asylum Officer's notes are internally consistent with regard to references to earlier questions, such as whether the respondent had stated that he

applied for a visa with anyone else. *At page 2 of the notes contained in Exhibit 5, the respondent was asked whether he applied for his visa with anyone else and the notes indicated that he stated that, "no, I applied by myself." Similarly, I note that the testimony before the Asylum Officer and the Court is consistent with the omission in the respondent's Form I-589 application for asylum, of an answer to the question of the date of the previous arrival of his wife, if she had previously been in the United States. See* Exhibit 2, page 2, part A.II, question 23. When asked about this omission, the respondent expressed surprise, stating that he told the preparer about their trip and indicated that he thought it had been filled out. Notwithstanding the respondent's statement in this regard, *I do observe that the omission is consistent with his lack of forthrightness before the asylum office as to his wife and daughter's travel with him to the United States and their subsequent return to China shortly thereafter*.

In sum, the respondent's testimony before the Court and his testimony regarding the Asylum Officer notes, as well as the notes themselves, clearly indicate that the respondent failed to spontaneously disclose that his wife and daughter came with him and then returned to China. His testimony and the notes also consistently demonstrate that the respondent paused at length, both before the Court and

before the Asylum Officer, when asked about this topic. His testimony and the Asylum Officer notes are also consistent in indicating that he ultimately testified that he was afraid to say that his wife came here and was afraid of being asked about why she went back. *Furthermore, the respondent has conceded that he was asked to "tell the real story" about his family's travel to the United States by the Asylum Officer, and that he replied that he wanted a good environment for his child and his wife had a job, but he did not, and that is why he stayed here.*

In *Loho v. Mukasey*, 531 F.3d 1016, 1018–19 (9th Cir. 2008), the Ninth Circuit addressed the situation in which an asylum applicant has found safety in the United States and then returns to the country claimed of persecution before eventually finding asylum in the United States. The Ninth Circuit held that the applicant's voluntary return to the country of claimed persecution may be considered in assessing both credibility and whether the respondent has a well-founded fear of persecution in that country. Here, while the respondent himself has not returned to China, his wife and daughter did. Indeed they did so shortly after arriving in the United States, and the respondent confirmed that they did so because the schooling is cheaper for his daughter in China, as well as because his father-in-law is elderly and needed to be cared for. The respondent also told the Asylum

Officer that the "real story" about whey [sic] his family returned was that his wife had a job and he did not, and that is why he stayed here. This is consistent with respondent's testimony before the Court that he did not have a job at the time he came to the United States. Furthermore, I note that the respondent's claim of persecution is founded on the alleged forced abortion inflicted upon his wife. That is the central element of his claim. The respondent claims that he himself was persecuted through his resistance to that abortion. Nevertheless, the fact remains that the fundamental thrust of the respondent's claim is that his wife was forced to have an abortion. In this regard, the respondent's wife therefore clearly has an equal, or stronger, claim to asylum than the respondent himself, assuming the facts which he claims are true. The respondent was asked why his wife did not stay and apply for asylum and he replied that he did not know they could apply for asylum at the time they departed. *The respondent was then asked why he stayed here after they returned; he said because he was in a bad mood and he wanted to get a job and a friend of mine is here.*

While *Loho v. Mukasey* applies to the applicant himself returning to China, I find that the reasoning of the Ninth Circuit in that case is fully applicable to the respondent's situation in that his wife, who is the primary object of the persecution in China, freely

chose to return to China. *I do not find that the respondent's explanations for her return to China while he remained here are adequate.* The respondent has stated that he was in a bad mood and that he had found a job and had a friend here. The respondent has also indicated that his daughter's education would be cheaper in China than here, and he has also indicated that his wife wanted to go to take care of her father. I do not find that these reasons are sufficiently substantial so as to outweigh the concerns raised by his wife and daughter's free choice to return to China after having allegedly fled that country following his wife's and his own persecution.

In view of the for[e]going, I find that the respondent has failed to meet his burden of proving eligibility for asylum under Section 208(a) of the Act.

(Emphasis added).

To erase any doubts about Dai's problematic testimony, the following is an excerpt from it.

MS. HANNETT TO MR. DAI

Q. And isn't it also true that the [asylum] officer asked why did they go back and you replied, so that my daughter can go to school and in the U.S., you have to pay a lot of money?

A. Yes, that's what I said.

Q. Okay. And isn't it also true that the officer asked you, can you tell me the real story about you and your family's travel to the U.S., and you replied I wanted a good environment for my child. My wife had a job and I didn't, and that is why I stayed here. My wife and child go home first.

A. I believe I said that.

\*     \*     \*

Q. So, once you got to the United States, why didn't your wife apply for asylum?

A. My wife just returned to China.

Q. Right, and my question is why didn't she stay here and apply for asylum?

A. At that time, we didn't know the apply, we didn't know that we can apply for asylum.

Q. Well, if you didn't know that you could apply for asylum, why did you stay here after they returned?

A.  Because at that time, I was in a bad mood and I couldn't get a job, so I want to stay here for a bit longer and another friend of mine is also here.

The asylum officer's interview notes discussed by the IJ (and found to be consistent with Dai's testimony before the IJ) read as follows:

Earlier you said your wife has only traveled to Australia, Taiwan and HK. You also said that you traveled to the US alone. Government records indicate that your wife traveled with you to the United States. Can you explain?

[long pause] the reason is I'm afraid to say that my wife came here, then why did she go back.

Your wife went back?      Yes

When did she go back to China?  February

Why did she go back?      Because my child go to school

Earlier you said you applied for your visa alone. Our records indicate that your child also obtained a visa to the US with you. Can you explain?

[long pause]

Daughter came with wife and you in January?
    Yes

Can you explain?  I'm afraid

Please tell me what you are afraid of.  That is
what your interview today is for.    To
understand your fears?

    I'm afraid you ask why my wife and
    daughter go back

Why did they go back?

    So that my daughter can go to school
    and in the US you have to pay a lot of
    money.

Can you tell me the real story about you and
your family's travel to the US?

    I wanted a good environment for my
    child.  My wife had a job and I didn't
    and that is why I stayed here.  My
    wife and child go home first.

(Bracketed notations in original).

## V

### The Role of an Asylum Officer

The majority's opinion perpetuates another acute error
our Circuit has made in its effort to control the DHS's

administrative process. In footnote 2, the majority say that if Dai concealed relevant information "it was only from the asylum officer." *Only* from the asylum officer? So Dai's admitted concealment *under oath* of germane information during a critical part of the evaluation process is of no moment?

The majority's demotion of the role of an asylum officer represents a sub silentio application of another faulty proposition on the books in our circuit: *Singh v. Gonzales*, 403 F.3d 1081 (9th Cir. 2005).

> Certain features of an asylum interview make it *a potentially unreliable point of comparison* to a petitioner's testimony for purposes of a credibility determination. *Barahona-Gomez v. Reno*, 236 F.3d 1115 (9th Cir. 2001), explained the significant procedural distinctions between the initial *quasi-prosecutorial* "informal conferences conducted by asylum officers" after the filing of an asylum application, and the "quasi-judicial functions" exercised by IJs . . . .

*Id.* at 1087 (emphasis added).

First of all, we may not have in this case a verbatim transcript of Dai's testimony, but we have the asylum officer's notes, which the IJ explicitly found to be accurate. Moreover, when appropriately confronted under oath with the notes, Dai admitted they correctly captured what he said. Under these circumstances, any concern that the asylum interview might be a "potentially unreliable point of comparison" to Dai's testimony is irrelevant. The record

(thanks to Dai himself) eliminates any potential for unreliability.

Second, the pronouncement in *Singh v. Gonzales* that an asylum officer's interview in an *affirmative* asylum case is "quasi-prosecutorial" in nature is flat wrong and reveals our fundamental misunderstanding of the process.[7]  An asylum officer in an affirmative asylum case does not "prosecute" anyone during the exercise of his responsibilities, and the process is not "quasi-prosecutorial" in nature.  In fact, unlike a prosecutor, an asylum officer has the primary authority and discretion to grant asylum to an applicant should the applicant present a convincing case.  The asylum officer's role is essentially judicial, not prosecutorial.  We miss the mark here because we see only those cases where an affirmative asylum applicant did not present a sufficiently credible persuasive case to an asylum officer to prevail, and we mistakenly conclude from that unrepresentative sample that asylum officers tend to decide against such applicants.

The true facts emerge from DHS's June 20, 2016 report to Congress, *Affirmative Asylum Application Statistics and Decisions Annual Report*, covering "FY 2015 adjudications of affirmative asylum applications by USCIS [U.S. Citizenship & Immigration Services] asylum officers for the

---

[7] An affirmative asylum case differs from a defensive asylum case involving someone already in removal proceedings.  *See Obtaining Asylum in the United States*, DEP'T OF HOMELAND SEC., https://www.uscis.gov/humanitarian/refugees-asylum/asylum/obtaining -asylum-united-states (last updated Oct. 19, 2015).

stated period."[8] By way of background, the Report points out that asylum officers have a central determinative role in the process. Asylum determinations "are made by an asylum officer after an applicant files an affirmative asylum application, is interviewed, and clears required security and background checks." *Id.* at 2.

The Report contains statistics about the activity of asylum officers. According to the FY2015 statistics, asylum officers completed 40,062 affirmative asylum cases. They approved 15,999 applications for an approval rate of 47% for interviewed cases. *Id.* at 3.

USCIS has a Policy Manual. Chapter 1 of Volume 1 establishes its "Guiding Principles."[9] A "Core Principal" reads as follows:

> The performance of agency duties inevitably means that some customers will be disappointed if their cases are denied. Good customer service means that everyone USCIS affects will be treated with dignity and courtesy regardless of the outcome of the decision.

---

[8] *2016 DHS Congressional Appropriations Reports*, DEP'T OF HOMELAND SEC., https://www.dhs.gov/publication/2016-dhs-congressional-appropriations-reports (last published Feb. 12, 2018) (follow "United States Citizenship and Immigration Services (USCIS) - Affirmative Asylum Application Statistics & Decisions FY16 Report" hyperlink).

[9] *Policy Manual*, U.S. CITIZENSHIP & IMMIGRATION SERVS., https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume1-PartA-Chapter1.html (Aug. 23, 2017).

*    *    *

USCIS will approach each case objectively
and adjudicate each case in a thorough and
fair manner.  USCIS will carefully administer
every aspect of its immigration mission so
that its customers can hold in high regard the
privileges   and   advantages   of   U.S.
immigration.

*Id.*

Finally, we look at the training given to asylum officers
in connection with their interviews of affirmative asylum
applicants.  In USCIS's Adjudicator's Field Manual, we find
in Appendix 15-2, "Non-Adversarial Interview Techniques,"
the following guidance.[10]

### I. OVERVIEW

An immigration officer will conduct an
interview for each applicant, petitioner or
beneficiary where required by law or
regulation, or if it is determined that such
interviewed [sic] is appropriate. *The interview
will be conducted in a non-adversarial
manner*, separate and apart from the general

---

[10] *Adjudicator's Field Manual - Redacted Public Version*,
U.S. CITIZENSHIP & IMMIGRATION SERVS.,
https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1.html
(follow "Appendices" hyperlink; then follow "15-2 Non-Adversarial
Interview Techniques" hyperlink) (last visited Feb. 15, 2018) (emphasis
added).

public. The officer must always keep in mind his or her responsibility to uphold the integrity of the adjudication process. As representatives of the United States Government, officers must conduct the interview in a professional manner.

\*   \*   \*

Due to the potential consequences of incorrect determinations, it is incumbent upon officers to conduct organized, focused, and well-planned, *non-adversarial interviews* . . . .

\*   \*   \*

## III. NON-ADVERSARIAL NATURE OF THE INTERVIEW

### A. Concept of the Non-adversarial Interview

A non-adversarial proceeding is one in which the parties are not in opposition to each other. This is in contrast to adversarial proceedings, such as civil and criminal court proceedings, where two sides oppose each other by advocating their mutually exclusive positions before a neutral arbiter until one side prevails and the other side loses. *A removal proceeding before an immigration judge is an example of an adversarial proceeding*, where the Service trial attorney is seeking to remove

a person from the United States, while the alien is seeking to remain.

The interview is part of a non-adversarial proceeding. The principal intent of the Service is not to oppose the interviewee's goal of obtaining a benefit, but to determine whether he or she qualifies for such benefit. If the interviewee qualifies for the benefit, it is in the Service's interest to accommodate that goal.

\*    \*    \*

**B.   Points to Keep in Mind When Conducting a Non-adversarial Interview**

The officer's role in the non-adversarial interview is to ask questions formulated to elicit and clarify the information needed to make a determination on the petitioner or applicant's request. This questioning must be done in a professional manner that is non-threatening and non-accusatory.

1. The officer must:

   a. Treat the interviewee with respect. Even if someone is not eligible for the benefit sought based on the facts of the claim, the officer must treat him or her with respect. The officer may hear similar claims from many interviewees, but must not show impatience towards any individual. Even the most non-

confrontational officer may begin to feel annoyance or frustration if he or she believes that the interviewee is lying; however, it is important that the officer keep these emotions from being expressed during the interview.

b. Be non-judgmental and non-moralistic. Interviewees may have reacted to situations differently than the officer might have reacted. The interviewee may have left family members behind to fend for themselves, or may be a member of a group or organization for which the officer has little respect. Although officers may feel personally offended by some interviewee's actions or beliefs, officers must set their personal feelings aside in their work, and avoid passing moral judgments in order to make neutral determinations.

c. Create an atmosphere in which the interviewee can freely express his or her claim. The officer must make an attempt to put the interviewee at ease at the beginning of the interview and continue to do so throughout the interview. If the interviewee is a survivor of severe trauma (such as a battered spouse), he or she may feel especially threatened during the interview. As it is not always easy to determine who is a survivor, officers should be sensitive to the fact that every interviewee is potentially a survivor of trauma.

Treating the interviewee with respect and being non-judgmental and non-moralistic can help put him or her at ease. There are a number of other ways an officer can help put an interviewee at ease, such as:

• Greet him or her (and others) pleasantly;

• Introduce himself or herself by name and explain the officer's role;

• Explain the process of the interview to the interviewee so he or she will know what to expect during the interview;

• Avoid speech that appears to be evaluative or that indicates that the officer thinks he or she knows the answer to the question;

• Be patient with the interviewee; and

• Keep language as simple as possible.

d. Treat each interviewee as an individual. Although many claims may be similar, each claim must be treated on a case-by-case basis and each interviewee must be treated as an individual. Officers must be open to each interviewee as a potential approval.

e. Set aside personal biases. Everyone has individual preferences, biases, and prejudices formed during life experiences that may cause them to view others either positively or negatively. Officers should be aware of their personal biases and recognize that they can potentially interfere with the interview process. Officers must strive to prevent such biases from interfering with their ability to conduct interviews in a non-adversarial and neutral manner.

f. Probe into all material elements of the interviewee's claim. The officer must elicit all relevant and useful information bearing on the applicant or beneficiary's eligibility. The officer must ask questions to expand upon and clarify the interviewee's statements and information contained on the form. The response to one question may lead to additional questions about a particular topic or event that is material to the claim.

g. Provide the interviewee an opportunity to clarify inconsistencies. The officer must provide the interviewee with an opportunity during the interview to explain any discrepancy or inconsistency that is material to the determination of eligibility. He or she may have a legitimate reason for having related testimony that outwardly appears to contain an inconsistency, or there may have been a misunderstanding between the officer and the interviewee. Similarly, there may be

a legitimate explanation for a discrepancy or inconsistency between information on the form and the interviewee's testimony.

On the other hand, the interviewee may be fabricating a claim. If the officer believes that an interviewee is fabricating a claim, he or she must be able to clearly articulate why he or she believes that the interviewee is not credible.

h. Maintain a neutral tone throughout the interview. Interviews can be frustrating at times for the officer. The interviewee may be long-winded, may discuss issues that are not relevant to the claim, may be confused by the questioning, may appear to be or may be fabricating a claim, etc. It is important that the officer maintain a neutral tone even when frustrated.

2. The officer must not:

• Argue in opposition to the applicant or petitioner's claim (if the officer engages in argument, he or she has lost control of the interview);

• Question the applicant in a hostile or abusive manner;

• Take sides in the applicant or petitioner's claim;

• Attempt to be overly friendly with the interviewee; or

• Allow personal biases to influence him or her during the interview, either in favor of or against the interviewee.

I hope that by exposing the particulars of the affirmative application process we will cease demeaning unspecified "certain features" of the applicant's interview, and that we will correct our uninformed characterization of it as "quasi-prosecutorial."

While under oath, Dai intentionally concealed material information from the asylum officer during a critical aspect of the process. To diminish the import of this potential crime[11] because the government official was "only" an asylum officer is a serious mistake.

## VI

### The BIA's Decision

Dai unsuccessfully appealed the IJ's decision denying his application for asylum, withholding of removal, and protection under the Convention Against Torture. The BIA's decision follows.

We review for clear error the findings of fact, including determinations of credibility, made

---

[11] 18 U.S.C. § 1001 makes it a crime knowingly and willfully to make a material false statement in any matter within the jurisdiction of the executive branch of Government.

by the Immigration Judge.  We review de
novo all other issues, including whether the
parties have met the relevant burden of proof,
and issues of discretion.  The respondent filed
his application for asylum after May 11, 2005,
and thus review is governed by the REAL ID
Act of 2005.

*We adopt and affirm the Immigration Judge's
decision in this case.  The Immigration Judge
correctly denied the respondent's applications
for failure to meet his burden of proof.*  The
record reflects that the respondent failed to
disclose to both the [DHS] asylum officer and
the Immigration Judge that his wife and
daughter had traveled with him to the United
States and voluntarily returned to China
shortly after.  *The respondent further
conceded that he was not forthcoming about
this information because he believed that the
true reasons for their return—that his wife
had a job in China and needed to care for her
elderly father, and that their daughter could
attend school in China for less money than in
the United States—would be perceived as
inconsistent with his claims of past and feared
future persecution.*

The Immigration Judge correctly decided that
the voluntary return of the respondent's wife
and daughter to China, after allegedly fleeing
following the persecution of the respondent
and his wife, prevents the respondent from
meeting his burden of proving his asylum

claim. *Contrary to the respondent's argument on appeal, the Immigration Judge need not have made an explicit adverse credibility finding to nevertheless determine that the respondent did not meet his burden of proving his asylum claim*. The respondent's family voluntarily returning *and his not being truthful about it is detrimental to his claim and is significant to his burden of proof*.

(Emphasis added) (footnote and citations omitted).

## VII

### The IJ Becomes a Potted Plant

My colleagues' opinion boils down to this faulty proposition: Simply because the IJ did not say "I find Dai not credible" but opted instead to expose the glaring factual deficiencies in Dai's presentation and to explain in specific detail and at length why Dai had not persuasively carried his burden of proving his case, my colleagues disregard the IJ's decision altogether and claim we must selectively embrace as persuasive Dai's problematic presentation regarding the core of his claim.[12]   Out of the blue, unpersuasive becomes persuasive.  I invite the reader to review once again the IJ's decision and to decide on the merits whether Dai's case is persuasive.  It is anything but.

My colleagues brush off the conspicuous blatant flaws in Dai's performance involving demeanor, candor, and

---

[12] And if an IJ does make an adverse credibility finding, we have manufactured a multitude of ways to disregard it.

responsiveness, claiming that "taking into account the record as a whole, nothing undermines the persuasiveness of Dai's credible testimony. . . ." Nothing? They disregard inaccuracies, inconsistencies, and implausibilities in his story, and his barefaced attempt to cover up the truth about his wife's and daughter's travels and situation. They even sweep aside Dai's admission to the asylum officer that the "real story" is that (1) he wanted a good environment for his child, (2) his wife left him behind because she had a job in China and he did not, and (3) he was in a "bad mood," couldn't get a job, and wanted to stay here "for a bit longer." In their opinion, there is not a single word regarding the factors cited by the IJ to explain his observations, findings, and decision, including the fact that Dai's wife, allegedly the initial subject of persecution in China, made a free choice to return. The effect of the presumption is to wipe the record clean of everything identified by the IJ and the BIA as problematic.

The glaring irony in my colleagues' analysis is that once they proclaim that Dai's testimony is credible, they pick and choose only those parts of his favorable testimony that support his case—not the parts that undercut it. If we must accept Dai's presentation as credible, then why not also his "real story" when confronted with the facts that he came to the United States because he wanted a good environment for his daughter, and that he did not return to China with his wife because she had a job and he did not? What becomes of his attempted cover up of the travels of his wife and daughter?

Furthermore, my colleagues' backhanded treatment of the IJ's opinion is irreconcilable with the BIA's wholesale acceptance of it. In words as clear as the English language can be, the BIA said, "We adopt and affirm the Immigration Judge's decision." To compound their error, the majority

then seizes upon and pick apart the BIA's summary explanation of why it concluded on de novo review that the IJ's decision was correct. What the BIA did say was that Dai's failure to be truthful about his family's voluntary return to China was "detrimental to his claim" and "significant to his burden of proof."

# VIII

## Analysis

And so we come at last to the statutory requirement of persuasiveness, an issue uniquely suited to be determined by the "trier of fact," as the Act and 8 U.S.C. § 1158(b)(1)(B)(ii) dictate. The majority opinion rigs this inquiry by freighting it with an incomplete record. The opinion inappropriately sweeps demeanor, candor, and plausibility considerations—as well as the IJ's extensive findings of fact—off the board as though this were a parlor game. Once again, the opinion ignores *Huang*, a post-Act case.

> The need for deference is particularly strong in the context of demeanor assessments. Such determinations will often be based on non-verbal cues, and "[f]ew, if any, of these ephemeral indicia of credibility can be conveyed by a paper record of the proceedings and it would be extraordinary for a reviewing court to substitute its second-hand impression of the petitioner's demeanor, candor, or responsiveness for that of the IJ."

744 F.3d at 1153 (alteration in original) (quoting *Jibril*, 423 F.3d at 1137).

Here, the IJ determined that Dai's testimony was not persuasive based on demeanor, non-verbal cues, and other germane material factors that went to the heart of his case. The IJ explained his decision in exquisite detail, and our approach and analysis should be simple. In order to reverse the BIA's conclusion that Dai did not carry his burden of proof, "we must determine 'that the evidence not only *supports* [a contrary] conclusion, but *compels* it—and also compels the further conclusion' that the petitioner meets the requisite standard for obtaining relief." *Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014) (alteration in original) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)). If anything, this record compels the conclusion that the IJ and the BIA were *correct*, not mistaken. Are my colleagues seriously going to hold that an IJ cannot take universally accepted demeanor, candor, responsiveness, plausibility, and forthrightness factors into consideration in assessing persuasiveness, as the IJ did here? And that this detailed record, which is full of Dai's admissions of an attempted coverup, *compels* the conclusion that Dai was so persuasive as to carry his burden? Dai accurately understood the damaging implications of his wife's return to China. So did the IJ and the BIA. So would anybody not willfully blinded by an inappropriate conclusive presumption. As the BIA stated, the truth is "inconsistent with his claims of past and feared future persecution."

## IX

## The More Things Change, The More They Stay The Same

In *Elias-Zacarias*, 921 F.2d 844 (9th Cir. 1990), *rev'd*, 502 U.S. 478 (1992), our court substituted the panel's

interpretation of the evidence for the BIA's. The Supreme Court reversed our decision, calling the first of the panel's two-part reasoning "untrue," and the second "irrelevant." 502 U.S. at 481. The Court warned us that we could not reverse the BIA unless the asylum applicant demonstrates that "the evidence he presented was *so compelling that no reasonable factfinder could fail to find the requisite fear of persecution*." *Id.* at 483–84 (emphasis added). In our case, we again fail to follow this instruction.

In *INS v. Orlando Ventura*, 537 U.S. 12, 13 (2002) (per curiam), the Court noted that both sides, petitioner and respondent, had asked us to remand the case to the BIA so that it might determine in the first instance whether changed conditions in Guatemala eliminated any realistic threat of persecution of the petitioner. Our panel did not remand the case, evaluating instead the government's claim of changed conditions by itself and deciding the issue in favor of the petitioner. *Id.* at 13–14. The Supreme Court summarily reversed our decision, saying "[T]he Court of Appeals committed clear error here. It seriously disregarded the agency's legally mandated role." *Id.* at 17.

Did we learn our lesson? Hardly. A mere two years after *Ventura*'s per curiam opinion, we knowingly made the same mistake in *Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) (en banc), *vacated*, 547 U.S. 183 (2006). We disregarded four dissenters to that flawed opinion, who argued in vain that our court's decision was irreconcilable with *Ventura*. In short order, the Supreme Court vacated our en banc opinion, saying that our "error is obvious in light of *Ventura*, itself a summary reversal" and that the same remedy was once again appropriate. 547 U.S. at 185.

With all respect, the majority opinion follows in our stubborn tradition of seizing authority that does not belong to us, disregarding DHS's statutorily mandated role. Even the REAL ID Act has failed to correct our errors.

Thus, I dissent.